**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| 520 SOUTH MICHIGAN AVENUE | ) | |
| ASSOCIATES LTD d/b/a THE CONGRESS | ) | |
| PLAZA HOTEL & CONVENTION CENTER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 C 01422 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| UNITE HERE LOCAL 1, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

UNITE HERE Local 1 (the "Union"), which represents many employees of Chicago's Congress Plaza Hotel (the "Hotel"), is nearly a decade into a strike that began in June 2003. This lawsuit addresses a portion of that labor dispute. The Hotel complains that union members used unlawful methods to persuade Hotel customers to express solidarity with the Union by taking their lodging, convention, or special event business elsewhere. The Union's contacts with nine diverse organizations and businesses are currently at issue. The Union moves for summary judgment, arguing that its actions, insofar as they are supported by admissible evidence, were protected by the First Amendment and were not an unfair labor practice as a matter of law. For the reasons that follow, the motion is granted.

## FACTS

The Court takes the following facts from the parties' statements of uncontested facts and the exhibits they submitted in support of their positions. In deciding on a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and

draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010).

The Union represents a bargaining unit that consists of the Hotel's housekeeping, uniform services, and food and beverage workers. The Union began a strike at the Hotel on June 15, 2003, that continues to this day. Almost every day, the Union conducts picketing outside the Hotel and urges people not to enter the building.

Sometime in 2008, the Union expanded its strategy to include the deployment of "delegations" to visit or otherwise contact Hotel customers and individuals or organizations affiliated with customers—such as event attendees, speakers, exhibitors, board members, and others connected to decision-makers who contracted with the Hotel. The Union's strategy was to leverage consumer pressure to force the Hotel to reconsider its positions in the labor dispute. The Union developed a formal training protocol for members of the delegations, which numbered from two to 10 people and included striking employees, Union staff members, and other volunteers or supporters from the community. The protocol called for the delegations to (1) "get in the door"; (2) introduce the members of the delegation and explain the purpose of the visit; (3) tell the personal stories of one or more striking employees; and (4) make a request for specific action, such as to stop doing business with the Hotel, to call someone else and urge them not to patronize the Hotel, or to sign a pledge of support for the Union. Sometimes the delegations left packets of written information about the strike. The delegations visited Hotel customers and secondaries on both public and private property. By January 2009, the Union was deploying as many as 10 to 15 delegations per day in connection with the Hotel strike; in one five-month period, the Union sent out more than 500 delegations. The ones that sparked this lawsuit (and remain in the case) are summarized below.

a. Ag Lab

The National Center for Agricultural Utilization Research (NCAUR or "AgLab") contracted with the Hotel to hold a conference there in April 2005. To dissuade it from doing so, the Union unsuccessfully wrote letters and telephoned NCAUR asking it to cancel the contract. Then, it very publicly delivered what the Union called a "cow pie valentine" to AgLab offices in Peoria, Illinois. On February 10, 2005, a five-member delegation arrived at the office in Peoria and handed the receptionist a heart-shaped candy box filled with dry cow manure. The delegation asked the receptionist to deliver it to the NCAUR meeting planner and say it was from the Union. The Union had announced its plans with a press release days earlier, and news media outlets accompanied the delegation when it delivered the "valentine." The press release stated that NCAUR's plan to cross the Union's picket line would "hurt [the Union's] efforts to win back quality healthcare." (The Union and the Hotel disagree about what the Union intended the "valentine" to accomplish.) Word of the stunt got back to Chicago, and "people were talking about it all over the hotel."

NCAUR did not cancel its contract, which included a block of 190 "room nights" from April 10 to 13, 2005. It held the conference as planned at the Hotel. However, the entire room block that had been reserved was not booked by individual attendees, who were responsible for making their own arrangements. The Hotel says that for the two days of the convention, there was a less-than-75% booking rate. The Hotel attributes the "reduced anticipated bookings" to the cow-manure stunt and the attendant publicity.

b. Chicago International Film Festival

Cinema/Chicago, which sponsors the Chicago International Film Festival, agreed to provide 100 room nights for the annual festival in 2005. A Union official wrote to organizers

3

and participants in the festival, asking that they cancel the room block reservation and stating: "It is not unlikely that strikers and supporters might be present outside the Chicago Theater on Oct. 6 during the opening gala in order to publicize this injustice with leaflets and bullhorns."

Sophia Wong Boccio of Cinema/Chicago was concerned about "negative publicity" and "embarrassment to the Film Festival." On September 29, 2005, Boccio sent a letter to the Hotel terminating the sponsorship agreement and canceling the reserved room block. This was primarily due to Boccio's fear of "something that might be bad" happening on the festival's opening night.

c. America's Next Top Model

Anisa Productions contracted with the Hotel to rent event space on September 5-8, 2008, to hold a casting call for the program "America's Next Top Model" ("ANTM"). On September 3 and 4, Union Research Director Lars Negstad and Boycott Coordinator Jessica Lawlor sent emails to groups of 18 and 26 supporters requesting that they telephone and email executives of Cover Girl, which sponsors ANTM, and Proctor & Gamble (which owns Cover Girl), urging them to convince ANTM not to cross the Union's picket line and hold the casting call at the Hotel. The emails provided telephone numbers and email addresses for the executives. Negstad later reported to supporters that the Cover Girl executive's voice mail box was full, and urged them to keep emailing instead of calling.

On September 4, 2008, the Union sent a press release to Chicago media outlets declaring: "Union to picket Congress Hotel during 'America's Next Top Model.'" The statement advised that picket signs would contain such colorful slogans as "American's Next Top Strikebreaker" and "Who wants a model covered in SCABS?"

Lawlor also contacted an official in a television performers' union, David Bresbis, and asked if he could assist with convincing ANTM to move its casting call. Bresbis in turn emailed Jeff Tobler or CW Network, which broadcasts ANTM, informing him of the "longstanding labor dispute at the Congress Hotel" and asking whether the casting call's venue had been changed. Bresbis informed Tobler that, through a third party, Bresbis had contacted Tyra Banks, the host of ANTM, and advised her of the labor dispute.

As of September 4, 2008, ANTM had decided not to hold its casting call at the Hotel; it selected another venue instead. The Union issued a press release stating that the event had been moved from the Hotel after its "coordinated extensive outreach" to affiliates of the program; it referred to "a swarm of concerned phone calls and emails."

d. Midwest Clinic

The Midwest Clinic is an annual band and orchestra conference for music educators. Before 2009, the Midwest Clinic was held at a Hilton hotel, with the Hotel serving as the secondary site for conference events and lodging of participants. Since 2009, the Midwest Clinic has been held at McCormick Place in Chicago.

The Union contacted Midwest Clinic Executive Director Kelly Jocius several times to persuade him not to use the Hotel during the Clinic. Sometime between 2004 and 2006, Mr. Jocius had a long, confrontational telephone call with Union Boycott Coordinator Teran Loeppke. During the animated call, both parties raised their voices. Loeppke insisted that the Clinic honor the strike and move its business from the Hotel.

Sometime thereafter, on three separate occasions, Loeppke came to the Midwest Clinic's office unannounced. Jocius refused to meet with him, and each time he was turned away at the door by staff members. Loeppke and Jocius exchanged emails that Jocius characterized as "more

civil and professional" than the telephone call had been. In 2008, Jocius received three letters from the Union asking that Midwest Clinic not use the Hotel.

A mass email and telephone campaign also took place. The Union circulated a list of names and telephone numbers, including some home telephone numbers, of board members of Midwest Clinic and performers at the Clinic. It also sent letters, which typically included requests to call Mr. Jocius, to cancel contracts with the Hotel, and to honor the picket line at the Hotel. Mr. Jocius heard "in waves" from board members about the Union's outreach. The clinic's exhibitors and a presenter also heard from the Union with solicitations not to use the Hotel. Ultimately, in 2009, the Clinic was moved from the Hilton, and it no longer used the Hotel for overflow bookings.

e. International Housewares Association

The International Housewares Association (IHA) conducts an annual consumer housewares trade show at McCormick Place in Chicago. IHA contracted with the Hotel to reserve room blocks from 2008 to 2011, but in February 2009, it canceled the 2009 booking, and in April 2009, it canceled the bookings for 2010 and 2011. IHA Vice President of Trade Shows Mia Rampersand and Vice President of Finance Dean Kurtis were the IHA's decision makers when it came to canceling the contracts.

In early 2009, Union Boycott Coordinator Jessica Lawlor had telephoned Rampersand and urged her to cancel the IHA's agreement with the Hotel, but Rampersand refused. In that or another telephone call, Lawlor told Rampersand that the Union had gone to the offices of IHA members, retailers, a trade publication, and a restaurant, and advised her that "it would not stop" as long as the IHA had a contract with the Hotel. The Union did not picket at McCormick Place or any other location in connection with its efforts to compel the IHA to cease its business with

Hotel. Nevertheless, Rampersand believes that Lawlor "mentioned the word 'picket'" during their conversation. Lawlor told Rampersand that the Union "had the ability" to go to McCormick Place.

Lawlor also sent delegations to IHA's offices to ask IHA to cancel the room block. In late January or early February 2009, a delegation of five or six Union officials aggressively pushed their way through the IHA reception area into an office and refused to leave until the police were called. On a following visit, IHA president Brandl met with a delegation of about six to eight Union members or supporters in a cafeteria.

Lawlor organized a phone bank to call various individuals believed to be affiliated with the IHA show. These people were not responsible for IHA's contracts with the Hotel. Phone bankers made numerous calls to each individual on a list of names they were given and were directed to read off of a script that urged them to contact Phil Brandl and tell him that IHA should not use the Hotel; individuals were also asked not to stay at the Hotel themselves. Lawlor also sent in-person delegations to various people affiliated with the IHA show during early 2009, to ask them to call Brandl and ask him to cancel IHA's reserved room block at the Hotel.

One such individual was celebrity chef Rick Bayless, who conducts cooking demonstrations at the IHA show. The Union sent three delegations to his restaurant to try to speak to management before organizing a fourth that distributed fliers. The Union hoped to get a meeting with Bayless and persuade him to contact IHA officials about the use of the Hotel; it wanted to get his attention with the leaflet. The leaflet contained four quotations from health inspections of Bayless's restaurants that Lawlor had obtained through requests for public records. The quotations pertained to food safety violations without further context, for example, without noting that the restaurants had passed their health inspections and were in substantial

compliance with the health code. The leaflet did not suggest or ask for a boycott of the restaurants. The leaflet did not explain the Union's dispute with the Hotel; it did provide the web address of the Union's Congress Hotel Strike website, without elaboration, and it clearly stated that the leaflet was "Produced by members of UNITE HERE Local 1."  Bayless reacted with "horror" to the leaflets and said that publicizing food safety violations "could possibly hurt" the restaurants. He alerted IHA and faxed the leaflet to them; on the same day, IHA informed Lawlor that it had canceled its 2009 contract with the Hotel.

Rampersand and Kurtis both testified that they canceled 2009 booking because of the Union's activities. Rampersand believed that the Union was "harassing" IHA and the participants in its housewares show. Kurtis was concerned that the Union's activities would escalate to picketing exhibitors.

At the time they canceled the 2009 contract, Kurtis and Rampersand were also aware that a Union delegation had gone to the headquarters of Ace Hardware in Oak Brook and requested that Ace solicit IHA to cancel its contract with the Hotel. Kurtis recalled being aware of several unidentified exhibitors, as well as an IHA board member, and one potential attendee. Both were aware of the Bayless incident.

There are numerous other examples of delegations at other businesses or organizations with a connection to the IHA show; however, the Union has cited testimony to the effect that those involved in the decision to cancel IHA's contract with the Hotel were not aware of these incidents before making the decision. The Hotel does not rebut this fact with admissible evidence.[1] Accordingly, those incidents are not recapitulated here.

---

[1] Specifically, there is no admissible evidence that the Union's contact with the following entities was known to the IHA decision makers at the time the room-block contracts were canceled: Walgreens, Crate & Barrel, the Berghoff Café, Emporium Luggage, and Macy's. Moreover, the

f. NeoCon

Merchandise Mart Properties ("MMP") contracted with the Hotel to reserve room blocks for its 2009 and 2010 NeoCon trade shows.

A Union delegation made one unannounced appearance at the Merchandise Mart office of Kari O'Shea, MMP's Director of Travel and Housing. The delegation advised O'Shea of the strike at the Hotel and told her that Union workers were not receiving fair wages. The Union's plan for NeoCon involved leafleting and contacting "board members of speakers and exhibitors, liaisons of committees of boards of both groups, and . . . exhibitor and website 'secondaries.'" Lawlor called for sending delegations to more than 100 NeoCon exhibitors in some fashion. The Union even sent delegations to exhibitors who were not staying at the Hotel. The packets that the in-person delegations carried included a leaflet containing the name of MMP President Chris Kennedy as a person to call and listing a telephone number. Kennedy did not have any travel or housing responsibilities for the NeoCon show. In 2009, Kennedy was contemplating a run for the open United States Senate seat in Illinois, but he "later withdrew his pursuit."

One individual who was contacted by the Union was NeoCon participant Arturo Febry. A Union delegation unexpectedly appeared at his office and delivered a flier. The flier stated, in part, that "NeoCon has booked rooms at the Congress Plaza Hotel, where workers have been on strike for over five years," and asked the reader to call Chris Kennedy and "tell him you don't want to stay in a dump like" the Hotel. The flier listed the main telephone number for the Merchandise Mart, which is one number through which Kennedy could be contacted. O'Shea received the flier in a forwarded email from Febry on April 8, 2009.

---

Hotel has dropped its claims that the Union violated the law in its dealings with the Radiological Society of North America.

At some time in April 2009, Kennedy became so incensed by the Union's activities that that he telephoned the Union's president, Henry Tamarin, yelled at him angrily, and hung up the phone. On April 14, 2009, NeoCon's housing vendor emailed the Hotel to cancel the room block for NeoCon, "[b]ecause picketers from outside [the Hotel] have started going to our exhibitor's places of business and using Chris Kennedy's name in their literature." O'Shea was responsible for the decision to cancel, and she was copied on the email; she did not dispute the explanation. The housing vendor later testified that "the condition of the hotel" also factored into the decision.

g. Chicago Comic and Entertainment Expo

Reed Exhibitors, organizer of the Chicago Comic and Entertainment Expo ("C2E2"), reserved a room block at the Hotel for attendees of its 2010 exhibition. More than 150 exhibitors and 30,000 attendees were expected.

Jessica Lawlor sent a letter to Reed's vice president, Lance Fensterman, informing him about the strike and asking him to cancel the room block reserved at the Hotel. In addition, Union delegations showed up unannounced at nine comic book stores to ask the owners or managers to call Fensterman and pressure him to cancel the C2E2 contract with the hotel, or to directly appeal to Fensterman during a scheduled appearance at the stores.

On December 15, 2009, Fensterman was approached by a Union delegation at Graham Crackers, a comic book store. Four to six striking employees approached him, delivered a letter, and asked him not to do business with the Hotel.

The same day, a Union delegation of six to ten people approached Fensterman at Challengers Comics. According to Fensterman, the delegates confronted him, "outlined their grievances" with the Hotel, and "beseeched" him not to use the Hotel. The delegates also said they would be coming to "any appearances" Fensterman did. Fensterman recalled that four of

five delegates carried signs about double the size of a letter-sized sheet of paper or perhaps up to two feet by one foot. He did not remember what the signs said. Some union members also stood outside Challengers, but they did not say anything to Fensterman and he did not remember them carrying signs. Fensterman reacted with "dread" upon seeing the delegation at Challengers; he found the confrontation "awkward, embarrassing, and uncomfortable," although the delegates were pleasant to him.

Before December 15, Fensterman had considered canceling the C2E2 contract with the Hotel because he had been contacted by certain retailers who had heard from the Union. After being personally confronted, Fensterman decided to cancel the contract. Fensterman said he was concerned about the Union "picketing" his customers' businesses.

h. WordCamp Chicago

WordCamp hosts an annual convention of "software enthusiasts who work with Wordpress software"—that is, bloggers. The conference was scheduled for June 2010 at the Hotel. The conference organizer, Lisa Sabin-Wilson, testified that she received a "barrage" of emails from, or solicited by, the Union. She was able to produce two such emails from the Union, from February 15 and 19, 2010. She was also contacted by email by Columbia College professor Barbara Iverson, an active participant in the Wordpress community, who later posted updates on her blog about the strike and the Union's efforts to move WordCamp. Iverson used her blog and Facebook to encourage supporters to use social media and the WordCamp blog to communicate with Sabin-Wilson, which they did in large numbers. Sabin-Wilson believed that the "barrage" of communications that ensued was "Union-driven." The Union's Jessica Lawlor became aware of Iverson's solicitations and supported them, but she did not use any social media, blogs, websites to communicate about WordCamp.

After being "barraged" by electronic communications, Sabin-Wilson informally polled WordCamp attendees about matters including whether they wanted the event to take place at a venue where a strike was in place. Sabin Wilson reported that the reaction was "If you can help it, don't." On February 18, 2010, WordCamp canceled its contract with the Hotel, even though earlier in February, Sabin-Wilson had stayed at the Hotel, enjoyed it, thought it had the "perfect space" for WordCamp. In canceling the contract, Sabin-Wilson reported that she received "a barrage of union emails" and that Union organizers had "email bombed" her—although she later testified that she primarily meant that there had been an outpouring of Facebook and Twitter reactions relating to Barbara Iverson's postings about the strike (which were never disavowed by the Union).

i. American Tango Institute

The American Tango Institute ("ATI") contracted with the Hotel to hold a tango festival there in August 2010. In May, ATI's president, Netza Roldan, received a letter from the Union informing him about the strike and asking ATI not to do business with the Hotel; informational fliers were also enclosed. The Union's Jessica Lawlor also emailed Roldan on May 7 and 11, asking that ATI cancel the event at the Hotel. She also registered on ATI's website to receive information about the tango event.

Also in early May, other union delegates contacted Roldan "multiple times on multiple occasions" by fax, mail, and telephone. On May 11, the Union left voicemail messages for ATI every ten minutes for at least an hour in the morning. Delegates left literature under ATI's office door, although no one from ATI had let the delegates into the secure building. Literature was also left in the door of the main entrance to the building, and another letter was posted on Rodan's office door. On May 11, Roldan called Union officials to tell them that he was not

interested in any communication with the Union. However, Roldan ultimately met with Union delegations on May 21 and June 16. During the meetings the Union asked Roldan to cancel the Hotel contract and said that it would solicit "all of ATI's contacts" to call him and ask him to cancel the contract. At the first meeting, Mr. Roldan thought that one Union representative was "very aggressive" and putting him down. When she became loud and upset, Roldan felt physically threatened and asked his assistant to be ready to call the police. Ultimately, however, the police were not called, and Roldan subsequently met with Union delegates a second time.

ATI eventually canceled its contract with the Hotel. It lost about $20,000 and had to change its marketing materials and contracts with artists and it reduced the number of sponsored events. In canceling the contract, Roldan was "very concerned" that the Union would expand its efforts and begin "harassing" participants, sponsors, members, and teachers.

## DISCUSSION

Based on these events, Hotel alleges that the Union committed unfair labor practices in its interactions with the Hotel's customers and their affiliates. *See* 29 U.S.C. § 187(a) ("It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158 (b)(4) of this title."). In particular, the Hotel contends that the Union's delegations engaged in secondary activity proscribed by Section 8(b) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(ii)(B).[2]

---

[2] In a labor dispute, the employer of the striking workers is the "primary." A "secondary" is a business with which the Union has no labor dispute, but which does business with or otherwise supports the primary. A secondary boycott "generally involves a labor union's exertion of pressure on a neutral employer with whom the union has no dispute, in order to force the neutral employer to stop dealing with the primary employer." *George v. Nat'l Ass'n of Letter Carriers*, 185 F.3d 380, 383 (5th Cir. 1999).

The NLRA forbids certain types of actions by a union that are designed to impact the primary employer but are directed at secondary employers. Specifically, § 8(b)(4)(ii)(B), as relevant here, provides that it is unlawful for a union "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person." *Id*. The statute goes on to provide expressly that it does not "prohibit publicity, other than picketing, for the purpose of truthfully advising the public . . . that a product or products are produced by an employer with whom the labor organization has a primary dispute . . ." *Id.*

Summary judgment will be granted when the admissible evidence demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Bielskis v. Louisville Ladder, Inc*., 663 F.3d 887, 898 (7th Cir. 2011). To survive a summary judgment motion, the non-moving party must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir.2010) (internal quotation marks omitted).

The Union contends that, as a matter of law, its delegations did not engage in proscribed secondary activity. It primarily argues that its activities did not "threaten, coerce, or restrain" the Hotel's customers as a matter of law, and that interpreting the statute otherwise would impermissibly restrain its First Amendment rights. The Union does not dispute that "an object" of its conduct was to persuade Hotel customers and their associates to support the Union's strike and cease doing business with the Hotel. But because it pursued the objective through non-coercive means, it argues, the limitation on secondary activity does not apply—regardless of

whether the secondaries were annoyed or burdened by the conduct. The Hotel, for its part, contends that the Union's "targeting" and "harassment" of Hotel customers rose to the level of coercive and threatening conduct. It further argues that the Union cannot avail itself of the First Amendment because its activity was not primarily expressive in nature; rather, it was *conduct*, not speech, and is not entitled to the breadth of protection the Union seeks.

The Supreme Court has recognized that the interests in preventing unions from achieving their objectives by burdening neutral parties must be balanced against the rights of the unions to publicize their labor disputes and solicit outside support. The Court has therefore interpreted the "coerce, threaten, or restrain" language of § 8(b)(4)(ii)(B) carefully. In *NLRB v. Servette, Inc.*, 377 U.S. 46 (1964), the Court held that it was not an unfair labor practice for a union to ask retail store managers not to stock the goods distributed by a wholesale distributor, Servette, with which the union had an ongoing dispute that included a strike. The Union had warned the store managers that it would distribute handbills in front of the stores that did not cooperate; the handbills would request that shoppers not purchase certain items that Servette distributed. *See id.* at 47-48. The Supreme Court rejected the argument that the union impermissibly threatened or coerced the store managers within the meaning of § 8(b)(4)(B)(ii) (in an earlier version) when it warned that it would distribute handbills to the public in front of the (neutral) stores (and did so). Noting that the statute expressly excludes "publicity . . . for the purpose of truthfully advising the public . . . that a product or products are produced by an employer with whom the labor organization has a primary dispute," *id.* at 55, the Court concluded that "[t]he statutory

protection for the distribution of handbills would be undermined if a threat to engage in protected conduct were not itself permitted." *Id.* at 57.[3]

The Court returned to the secondary boycott restrictions in *DeBartolo Corp. v. Fla. Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568 (1988). In that case, a union engaged in handbilling at the entrances to a shopping mall owned by DeBartolo, asking customers not to shop there. The union had a dispute with a construction company, H.J. High, that was building a department store in the mall pursuant to a contract with mall tenant H.J. Wilson Company. The union had no dispute with DeBartolo, or with any of the other 85 stores in the mall, none of whom had any say in Wilson's selection of a contractor. But its handbills called for a boycott of the whole mall "until the Mall's owner publicly promises that all construction at the Mall will be done using contractors who pay their employees fair wages and fringe benefits." *Id.* at 570. The handbilling went on for three weeks, unaccompanied by any picketing. *Id.* at 571. DeBartolo filed a complaint against the union, but the Supreme Court ultimately held that to avoid serious First Amendment problems, § 8(b)(4)(ii)(B) could not be interpreted to preclude the union's peaceful handbilling of the mall. Absent evidence that Congress clearly intended the statute to reach the conduct at issue, it must be construed to allow peaceful, truthful handbilling, which is protected by the First Amendment. *See id.* at 575-576. The Court explained: "[T]his was expressive activity arguing that substandard wages should be opposed by abstaining from shopping in a mall where such wages were paid." *Id.* at 576. As one Court of Appeals has since noted: "After *DeBartolo*, it is clear that unlike picketing or patrolling, handbilling directed at secondary consumers is ordinarily not coercive and therefore does not run afoul of

---

[3] The scope of this proviso is limited by other terms (not quoted) to publicity directed to customers of a distributor of goods produced by an employer with whom the union has a labor dispute. Otherwise it would largely be dispositive of the issues in this case.

§(b)(4)(ii)(B)." *Sheet Metal Workers' Int'l Ass'n Local 15 v. NLRB*, 491 F.3d 429, 437 (D.C. Cir. 2007).

The Supreme Court in *DeBartolo* cautioned against interpreting the statutory terms "threaten, coerce, or restrain" too broadly. *Id*. at 578. "[M]ore than mere persuasion" is required for a violation. Even if it has "some economic impact on the neutral," not all "handbilling, picketing, or other appeals to a secondary employer to cease doing business with the [primary] employer is 'coercion.'" *Id*. In other words, to show "coercion," it is not enough that the union's persuasive efforts, if successful, would cause a loss of revenue to the neutral. *Id*.

On the other hand, activity, especially picketing, that "actually threaten[s] the neutral with ruin or substantial loss" violates § 8(b)(4)(ii)(B). *Id*. at 580 (citing *NLRB v. Retail Store Employees*, 447 U.S. 607 (1980) ("*Safeco*")). Picketing, unlike handbilling, relies not just on the persuasive force of the message, but also on imposing an intimidating physical barrier. *See DeBartolo*, 485 U.S. at 580; *Safeco*, 447 U.S. at 619 (Stevens, J., concurring). Adding this element of persuasive "conduct" to the communication can push the union's activity over the border into coercion. But, again, the Supreme Court has been loath to draw bright lines; not *all* peaceful consumer picketing of neutral sites violates § 8(b)(4)(ii)(B). *NLRB v. Fruit & Veg. Packers*, 377 U.S. 58, 63 (1964) ("*Tree Fruits*"). In restricting secondary picketing, Congress was primarily concerned with "its use to cut off the business of a secondary employer." *Id*. at 68. The restriction must be interpreted in that vein.

The Hotel argues that the Seventh Circuit's pre-*Bartolo* decision in *Boxhorn's Big Muskego Gun Club, Inc. v. Electrical Workers Local 494*, 798 F.2d 1016, 1019 (7th Cir. 1986) is especially relevant in setting out the permissible scope of secondary handbilling. In that case, a regional labor council distributed handbills and picketed outside a gun club at which non-union

laborers were performing work; the protesters urged a boycott of the gun club. The Seventh Circuit affirmed the district court's conclusion that picketing occurred and that the gun club was not the primary employer; accordingly, the conduct violated the secondary boycott provision of § 8(b)(4)(ii). *See id*. at 1021.

The Hotel represents that *Boxhorn's* stands for the proposition that "[h]andbilling that calls for boycotts of a business as a whole and which is not limited to a call to boycott just the work performed by the primary (*i.e.*, the 'product') is coercive and illegal." See Brief, Dkt # 175 at 24. Even more boldly, the Hotel says that "no authority has challenged *Boxhorn*'s holding or reasoning since *DeBartolo* was decided." There are two critical problems with this statement. First, if *Boxhorn's* stood for the proposition for which the Hotel cites it, it would surely be called into question by the core holding of *DeBartolo*. But it does not stand for that proposition, which is the second problem. In its supplemental *per curium* opinion, on the union's motion for rehearing, the Seventh Circuit backed off of whatever statements it made with respect to secondary handbilling, and confined its ruling only to the secondary *picketing* that had occurred. The Court explained: "It is enough in this case to say that handbilling *that is part of a course of conduct that includes picketing and blocking the approach of patrons* is prohibited by § 8(b)(4) unless exempted by the publicity proviso. No broader holding is necessary to decide this case, and the language in our original opinion should be read against this caveat." *Id*. at 1024 (emphasis added). In light of that directive, the Hotel's effort to characterize *Boxhorn's* as a handbilling case, and one totally unaffected by *DeBartolo*, comes close to exceeding the boundaries of legitimate advocacy.

Turning back to the matter at hand, in this case the Union did not engage in picketing of the relevant entities—at least not as far as the admissible evidence in the record shows. There is

no evidence that any of the in-person delegations intended to or in fact did create a physical barrier between the delegated organization and any customers, employees, or volunteers seeking physical access to the facilities. Delegates engaged in leafleting, made unannounced visits, attempted to speak with particular individuals, and dropped off written materials; these activities fall short of picketing as the term has been construed. Therefore, the most problematic activity that § 8(b)(4)(B)(ii) was meant to address did not occur here.

Still, other secondary conduct can violate the law. The restriction on secondary activity is "keyed to the coercive nature of the conduct, whether it be picketing or otherwise." *Tree Fruits,* 377 U.S. at 68. The burden is on the Hotel to "prove that the union intended to pressure the secondary employer and that the union engaged in illegal conduct to that end." *Carpet Service Int'l v. Chi. Reg. Council of Carpenters*, 698 F.3d 394, 400 (7th Cir. 2012).

The Court must therefore look to the particular conduct relevant to each secondary to see whether the Hotel can make the case that in the absence of picketing, the Union's actions rose to the level of coercion or threats. Before doing so, however, there are several determinations that can be made about conduct common to most, if not all, of the delegations at issue. First, in this case, the Union's use of telephone calls, letters, and emails (and to a lesser extent, blog posts and social networking websites, to the extent attributable to the Union) to communicate with Hotel customers, their affiliates, and the public at large, does not transform what would otherwise be protected speech into unlawfully coercive speech. It is hard to see why this difference in the means of communicating—provided that it stopped short of unlawful secondary picketing, which it did—would render the communication more "threatening" or "coercive." Persuasion with written communication is specifically allowed. *DeBartolo*, 485 U.S. at 578. And the line between "coercion" and "persuasion" is not crossed just because a direct appeal—by telephone, email, or

19

letter— is used rather than blanket handbilling. *See George v. Nat'l Ass'n of Letter Carriers*, 185 F.3d 380 (5th Cir. 1999).

In *George*, a postal uniform salesman was fired because a union used letters to threaten a boycott of his company because it objected to his other work, as a consultant critical of certain postal workers. Although he lost his job because his employer feared the economic ramifications of a boycott on uniform sales, the Fifth Circuit rejected the argument that the union had impermissibly "coerced" his employer. *See id.* at 389. It concluded that "there is no evidence" that Congress intended to restrict letter-writing or aggressive advertising even if it "effectively persuaded consumers not to patronize a secondary employer." *Id.* The Hotel has not cited any authority to the effect that the NLRA does or should restrict forms of communication such as letter-writing, emailing, and phone-banking, directed at neutrals, in a union's efforts to drum up support of a boycott of the primary. Indeed, letter writing (and, in this Court's view, email and phone calls) "has even fewer potentially coercive, threatening, or restraining characteristics than does even handbilling or other in-person communication" and is arguably entitled to "correspondingly greater First Amendment protection." *See id.* at 391-92. *See also Boxhorn's*, 798 F.2d at 1019 (discussing First Amendment concerns with applying § 8(b)(4)(ii)(B) to content of newsletter).

Moreover, although it is possible that emails, phone calls, and other means *could* be used to communicate unlawful threats, there is no evidence that any of the communications in this case contained such threats. Certainly there is no evidence that anyone was threatened with physical harm or something equally foreboding. Almost without exception, the Union conveyed in this case effectively the same message it disseminated by leaflets in *Servette* and *DeBartolo*; that is, to stop using the primary employer's goods or services. Instead of always appealing to the

general public through handbilling or leafleting, the Union tailored its message to particular customers and individuals whom it perceived to have influence (if not actual control) over the use of the Hotel by certain neutrals. But the Hotel does not point to any specific statement that rises to the level of a threat to engage in unlawful, rather than protected, activity, such as picketing at the Hotel during the neutrals' events, hand billing at other locations, or continued efforts to contact event participants to encourage their support for the Hotel strike. *See Servette*, 377 U.S. at 57. The unsubstantiated "concerns" about picketing of the secondaries, expressed by certain decision-makers who canceled contracts with the Hotel, are irrelevant absent specific evidence that unlawful picketing of a neutral was threatened. Moreover, even a threat to engage in secondary picketing is not inherently unlawful, as long as there are some conditions under which the picketing could be lawful. *See Sheet Metal Workers*, 491 F.3d at 435-36.

A third point of general application is that the Union delegations' unannounced and unwelcomed visits to neutrals do not run afoul of the restrictions on secondary activity because they did not involve impermissible threats or coercion. There is no dispute that the purpose of the in-person visits was to communicate with individuals whom the Union believed could influence the neutrals not to use the Hotel. This is the same lawful purpose that unions are permitted to accomplish through handbilling and letter-writing, so this case does not implicate *Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992), or *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105 (1956), the landmark cases addressing the rights of an employer to restrict non-employee union organizers from delivering informational or recruiting materials to employees on its private property. But the Hotel has not submitted evidence sufficient to create a fact issue as to whether the visits by the delegations were coercive. They have adduced no evidence whatsoever that the delegations resorted to any physical threats and although it is clear that some of the delegated entities or

individuals felt "harassed," that does not make the conduct "coercive" or "threatening" with respect to the neutrals' business. Congress's intent in passing § 8(b)(4)(ii), as construed by the Supreme Court, was primarily to protect neutrals from business disruption. *See Tree Fruits*, 377 U.S. at 68; *George*, 185 F.3d at 385. The Hotel failed to submits evidence that the organizations here suffered meaningful operational losses as a result of in-person delegations. Accordingly, § 8(b)(4)(ii)(B) cannot be read to prohibit the in-person solicitations that occurred here, even if they were unwelcome.

With these overarching principles in mind, the Court examines the Union's conduct toward each neutral organization the Hotel alleges was subjected to unlawful secondary activity.

a. AgLab

The Union argues that the Hotel's claim is untimely as it pertains to the "cow pie valentine" incident. The Court agrees. Indeed, the original complaint in this case was dismissed in part because the prior presiding judge concluded that the five-year statute of limitations had run as to that incident. Order, Dkt. #22 at 3-4 (St. Eve, J.). The Hotel nevertheless included the incident in the amended complaint, and the Union re-argued the statute of limitations in its second motion to dismiss. *See* Memorandum, Dkt. #34 at 7. The Court did not address the argument again in resolving that motion. *See* Order, Dkt. # 93. However, the amended complaint did not plead any facts that undermine the Court's initial analysis that any claim as to AgLab is time-barred. Accordingly, the motion for summary judgment is granted as it pertains to the Union's contact with AgLab.

b. Chicago International Film Festival

Arguing against summary judgment, the Hotel contends that the Union's "threats" to distribute leaflets or use bullhorns outside the opening-night gala were coercive because that

conduct could cause the festival, a neutral, to suffer "ruin or substantial loss." There is very little evidence to support the notion that such activity would have had that effect; the evidence shows that the organizer worried instead about "interference" and "embarrassment," which are not the same. In any event, the leafleting activity permitted in *Servette* and *DeBartolo* is insufficiently distinguishable from the conduct the Union threatened to engage in with respect to the festival. The Union specifically threatened to use leaflets and bullhorns to publicize the "injustice" of the Hotel workers' treatment. That message is protected by the First Amendment, and the Hotel does not cite any authority to support its argument that the message becomes coercive if amplified by a bullhorn. *DeBartolo* forecloses the argument that distributing leaflets about a pending labor dispute is threatening or coercive conduct. And *Safeco*, the only case that the Hotel cites, does not support its argument, because it pertained to secondary picketing that was financially ruinous to the secondary. *See* 447 U.S. at 615-616. Here the record evidence does not show that any picketing of the film festival was threatened. And using bullhorns, which the Hotel particularly disdains, is more akin to leafleting than picketing because its objective is to communicate a message, whereas picketing, as discussed earlier, entails an element of conduct that physically impedes patrons of the neutral. In theory, some level of excessive noise might amount to a physical obstacle that would drive people away. However, at that level, the noise would likely be subject generally applicable constitutional time, place and manner restrictions. *E.g., Kovacs v. Cooper*, 336 U.S. 77, 86-87, (1949) (ordinance prohibiting "loud and raucous" noise could be invoked to regulate labor protestor's use of an amplified sound truck). There is no evidence in the record here as to whether the (hypothetical) bullhorn would have exceeded permissible levels, though.

The Hotel has failed create a genuine issue of material fact as to whether the Union used unlawful threats or coercion in its contact with the organizers of and participants in the film festival.

c. America's Next Top Model

The Hotel contends that the Union's "frenzied blitz" of activity to prevent ANTM's casting call was so extensive as to rise to the level of coercion. According to the Hotel, the Union did not rely on persuasion but instead used "the power of harassment" to bully ANTM into submission. The Court disagrees.

Although the Union's communicative efforts were directed at a large number of people, the evidence shows that the message was exclusively about the labor dispute with the Hotel, and was not disseminated through means that are prohibited by the NLRA. So far as the Court is aware, the secondary boycott restrictions have never been applied to prohibit direct appeals to individuals, and in *Servette*, the direct in-person appeals to store managers, at their place of business, was allowed. Certainly the Hotel cites no authority to suggest that direct contact with individuals to convince them not to deal with a struck employer is unlawful. Perhaps for that reason, the Hotel relies on the sheer volume of contacts—the number of individuals contacted and the number of contacts per individual— in order to show that the Union engaged in coercion. Again, it is off-base. The secondary boycott restrictions are concerned with economic coercion— interference with the neutral's business. There is no evidence that the Union threatened to ruin ANTM as a going concern. Instead, the Union asked the show to film elsewhere and honor the picket line at the Hotel. This is a permissible request, and there is no evidence to suggest that the emails and phone calls relied on economic coercion rather than the persuasive force of the Union's message. The Hotel also argues that the Union's repeated emails and telephone calls

were not really speech but conduct because they amounted to "swarming" behavior. Perhaps such a case could be imagined—a volume of contacts so frequent or numerous as to paralyze the neutral—but the Hotel has not identified any authority so holding and the evidence in this case does not show that interference anywhere close to that extreme degree occurred here.

d. Midwest Clinic

The Hotel reiterates its novel speech-as-conduct argument with respect to Midwest Clinic, another event where the Union's activity was confined to email, telephone calls, and face-to-face communication. This was not "speech," says the Hotel, even though the Union's message was that the Clinic should not use the Hotel because of the labor strike there. Instead, because it involved "animated scolding" on the telephone, "unannounced" visits, and "mass" contacting of affiliates, the Union was engaged in the kind of coercive conduct that § 8(b)(4)(ii)(B) forbids.

Again, the argument is not supported with any legal authority, and the Hotel fails to distinguish the secondary conduct here from what *DeBartolo* allows. The Union's campaign to pressure Midwest Clinic to move from the Hotel was based solely on its message that the picket line should be honored and the Hotel should be boycotted until the labor dispute was resolved. And the Court does not see how the means by which this message was disseminated were inherently coercive or threatening. Again, "coercion" has been interpreted as placing the neutral's business in jeopardy; here, there is no evidence that the event was placed in jeopardy by the Union's conduct. Certain individuals were inconvenienced by multiple calls and emails, but there is no evidence that those communications contained "threats" or were so numerous or so burdensome as to jeopardize the event or preclude Midwest Band from pursuing its ordinary activities. The Hotel has not established that there is a genuine issue of material fact regarding the Union's solicitations of Midwest Band and its affiliates.

25

e. International Housewares Association

Jessica Lawlor's telephone calls to Mia Rampersand did not violate § 8(b)(4)(ii)(B); although Ms. Rampersand reported that Lawlor "made threats," she did not describe any unlawful "threat" within the meaning of the statute. The statement that the Union had the ability to go to McCormick place could only be an unlawful threat if Lawlor was threatening not only to picket at the site but to do so in a manner that jeopardized the show (recall that under *Tree Fruits*, not all secondary picketing is forbidden). Ms. Rampersand's vague recollections of the word "picket" being used are not enough to create a genuine issue of material fact with respect to whether the Union engaged in unlawful threats and coercion. And the phone banking, as far as the evidence shows, involved only the dissemination of the Union's request that affiliates of the show express solidarity with the Union by contacting the IHA president and urging him to cancel the contract with the Hotel. There is nothing threatening or coercive about this message, and the large volume of calls does not change that.

The conduct of the in-person delegations to IHA offices, however, present a closer question. While, as noted, such visits are not *per se* forbidden by § 8(b)(4)(ii)(B), they may be if accompanied by communication and/or additional conduct that rises to the level of threats or coercion. On the first visit, the delegates "pushed their way" into the reception area and IHA personnel had to call the police in order to get them to vacate. This conduct—physical invasion of the secondary's place of business (whether or not it constitutes trespassing) could reasonably be viewed as carrying with it the implication that absent cooperation with the union's goals the union may resort to similar disruptions and violations of the physical and operational integrity of the business or other violations of the law.

But in this case, it is clear that the IHA did not regard the union's behavior in that way, because IHA did not cancel the Hotel contract to keep the Union at bay. Instead, the IHA president subsequently met with the Union delegates voluntarily, on IHA property. There is no evidence that at these meetings he was threatened or coerced in any way; the Union simply made its pitch for boycotting the Hotel. Under these facts, the Hotel would be unable to prove, as it must under the LMRA, that the potentially threatening or coercive activity, rather than simply persuasion, directed at the IHA caused its damages (cancellation of the Hotel contract). See 29 U.S.C. § 187(b) (allowing damages for "injury in [] business of property *by reason of*" an unfair labor practice). There is a similar lack of evidence of threats or coercion as to most of the delegations who visited IHA exhibitors or other affiliates, to the extent that the IHA decision-makers knew about those contacts before deciding to cancel the Hotel contract.

The possible exception is the "Food Safety" flier that was disseminated at Rick Bayless's restaurants, which the Court finds more problematic. The Union is entitled to persuade neutrals to boycott the primary; and there is nothing to suggest that they cannot also persuade the neutrals to exert whatever influence they have to persuade the primaries, provided that the neutrals are free to decline these requests. "Persuasion," though, denotes some link to the force of the union's message. *See DeBartolo*, 485 U.S. at 580 ("loss of customers because they read a handbill urging them not to patronize a business, and not because they are intimidated by a line of picketers, is the result of mere persuasion, and the neutral who reacts is doing no more than what its customers honestly want it to do"); *see Safeco*, 447 U.S., at 619 (Stevens, J., concurring) (also noting that handbills, unlike picketing, "depend entirely on the persuasive force of the idea").

Here, however, (and unlike in *DeBartolo*) the food safety flier did not communicate any truthful message about the Union's labor dispute or any message about workers' rights in

general. The only message that the Union was communicating was the implicit warning that if Mr. Bayless did not cave in to the Union's demands for a meeting, or did not work to convince IHA to boycott the Hotel—*regardless whether he actually was persuaded by the Union's message*—he would risk having his restaurants harmed by the widespread dissemination of unflattering publicity not about his position on the Hotel strike but about the "safety" of his restaurants. Arguably, trying to compel neutral business to act by attacking it on matters that have nothing to do with the labor dispute—whether the facts used in the attack are true or false— veers away from "persuasion" and toward extortion.

But the Union argues that this kind of *ad hominen* attack on neutrals is protected; indeed, it says that the content of its message cannot be examined at all lest § 8(b)(4)(ii)(B) turn into an impermissible content-based restriction on speech.[4] It cites *Sheet Metal Workers' Int'l Ass'n, Local 15, AFL-CIO v. NLRB.*, 491 F.3d 429 (D.C. Cir. 2007), in which the court upheld the union's staging of a "mock funeral" at a hospital and distribution of leaflets about malpractice lawsuits against the hospital, where the union was in a primary dispute with two non-union companies doing work inside the hospital. The mock funeral, "a combination of street theater and handbilling," the court found, had none of physically coercive aspects of picketing and was addressed at customers, not the employees of the neutral hospital. *See id*. at 437-38. "[A] person of ordinary fortitude" would not be intimidated from entering the hospital. *Id*. at 439. Moreover,

---

[4] Any attempt to distinguish coercive or threatening publications from those that are not requires examination of the content. It does not follow, however, that the distinction cannot be made without treading on the First Amendment. "Numerous cases hold that governments may proscribe threats, extortion, blackmail and the like, 'despite the fact that they criminalize utterances because of their expressive content.'" *Gresham v. Peterson*, 225 F.3d 899, 909 (7th Cir. 2000) (citing cases). If, for example, the content of the handbill amounted to "extortion" there would be no First Amendment conflict in construing §8(b)(4) to forbid it; in other words, the *Catholic Bishop* rule of constitutional avoidance would not even apply. *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 501 (1979)).

although the union's morbid message "may have been unsettling or even offensive to someone visiting a dying relative," "unsettling and even offensive speech is not without the protection of the First Amendment." *Id.* The court, though, did not examine the potential coercive effect of the malpractice flyers on the hospital itself. The Union also points to *Hosp. & Service Employees Union, Local 399 v. NLRB*, 743 F.2d 1417 (9th Cir. 1984), in which the Ninth Circuit reversed the NLRB's finding of a § 8(b)(4)(ii)(B) violation based on handbills that trumpeted an airline's accident record when the union had a dispute not with the airline but its janitorial service. *Id.* at 1428. The Ninth Circuit rejected the "content-based" approach and remanded to the agency for a determination whether the handbills were coercive. When the Supreme Court's *DeBartolo* decision came out in the meantime, the NLRB dismissed the airline's complaint.

In this case, although the food safety flyer contains no message designed to convince anyone that the Union has the better of the arguments in its labor dispute with the Hotel—a fact that stretches the definition of "persuade" to its limits—the Union is nevertheless correct that restricting this expression would create a First Amendment conflict. So far as the record shows, the handbilling was unaccompanied by any of the coercive hallmarks of picketing, such as physical or verbal interference with restaurant patrons or patrolling of the area. *See Sheetmetal Workers*, 491 F.3d at 438. This method of handbilling has been explicitly approved. *See DeBartolo*, 485 U.S. at 588. It is therefore only the content of the flyers—not the means of dissemination—that can be found objectionable. If the health violations had been private or secret information, then the Union's actions might be deemed extortionate,[5] at which point the First Amendment would present no barrier to banning them. But this information was in the

---

[5] *See, e.g.*, Model Penal Code § 212.5, which defines "criminal coercion" as threatening, "with purpose unlawfully to restrict another's freedom of action to his detriment " to "expose any secret tending to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute."

public domain and could have been broadcast at any time; the Union merely made it more accessible in the hopes of getting attention (and in so doing, took a risk that its stunt would turn Bayless *against* the Union). For that reason, it came close, but did not cross the line into conduct the First Amendment would not protect.

As a general matter, a law that restricted passing out, on public property, handbills that contained truthful information about a restaurant's health code violations would likely not pass constitutional muster.[6] *See Watchtower Bible & Tract Society v. Vill. of Stratton*, 536 U.S. 150, 160-162 (2002). Indeed, *Snyder v. Phelps*, 131 S. Ct. 1207 (U.S. 2011) makes clear that far more disturbing, hurtful forms of expression are permitted than that which insults the reputation of a celebrity chef. The fact that the Union did not especially care about the food safety at Bayless's restaurants does not transform its speech into an unfair labor practice. *Cf. Sheet Metal Workers*, 491 F.3d at 439. "Especially within the labor context," exerting "social pressure" by using publicity that disparages a neutral, "may be harassing, upsetting, or coercive," but it is nevertheless protected by "settled First Amendment principles." *Metropolitan Opera Ass'n v. Local 100, Hotel Employees and Restaurant Employees Int'l Union*, 239 F.3d 172, 178 (2d Cir. 2001) (reversing injunction directed at union conduct including disparagement of neutral opera house in context of its food vendor's dispute with union). Concluding otherwise would subordinate the First Amendment to the NLRA, when the opposite hierarchy is required. *See*

---

[6] Whether the handbills concerning Bayless's restaurants were literally true or not, it might be argued that they were misleading in that they omitted any information about the union's agenda. Recipients of the handbills were deprived of facts that would have allowed them to assess the reliability of the information they had been provided; knowing that the information was being provided by a union seeking to persuade Bayless to support its cause against another employer, unrelated to issues of food safety, doubtless would have diminished the presumed negative effect of the handbills on the restaurants. The Hotel has not made this argument, however, and in any event the Court is aware of no authority holding that the dissemination of misleading information could rise to the level of coercion under § 8(b)(4), so there is no need to address the question further here.

*NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 500 (1979) (NRLA "ought not to be construed to violate the Constitution if any other possible construction remains available").

And, in any event, the Court is grappling with issues the Hotel did not develop in any meaningful way. The Hotel's untenable position is that all of the Union's expressive conduct toward the IHA—from making phone calls to passing out the food safety flyer—was threatening and coercive secondary activity. Because the Hotel did not attempt to draw any meaningful legal distinctions between the types of expressive activity at issue, the Court is not inclined to carve out as impermissible some sliver of conduct based on a theory never advanced by the Hotel. In treating all of the Union's conduct as equally threatening and coercive, the Hotel has failed show that any of it was.

Accordingly, as to all of the challenged activity related to the IHA show, the Hotel fails to establish that there is any genuine issue of material fact precluding summary judgment.

f. NeoCon

The Union's efforts to get MMPI to cancel its room block with the Hotel during NeoCon—by mailing, emailing, and telephoning NeoCon participants and affiliates and asking them, among other things, to contact Chris Kennedy—are another example of protected communication, as far as the record evidence shows.

Again, it is clear that one individual in particular—Mr. Kennedy—was personally offended by the Union's outreach. But there is no evidence whatsoever that he was threatened, or that the Union's campaign had a coercive effect on MMPI. As the Union argues, it could have stood outside the Merchandise Mart handing out the same leaflets that it distributed by mail and email; the way it disseminated the fliers is not inherently more threatening or coercive.

The Hotel also says that the Union intended to "terrorize" Mr. Kennedy with "voluminous" calls and to extort him into canceling the contract by tarnishing his image when he was contemplating a run for political office. This argument falls short in every conceivable way. First, there is no evidence that shows that the Union knew Kennedy was "considering" a run for the Senate seat. Second, the message the Union put out was no more "tarnishing" than the leaflets were to DeBartolo. Kennedy did not control the housing vendor's choice of hotels for NeoCon; neither did DeBartolo control the choice of building contractor in that case. But it was permissible to "tarnish" DeBartolo's name and "drag" it into an unrelated labor dispute. There is no meaningful distinction here. And third, there is no evidence that the distribution of leaflets could have, or did, result in a volume of calls to Mr. Kennedy so large as to "terrorize" him, nor is there any evidence that the Union's activities are what led him to relinquish his bid for Senate. This is one of a number of examples where the Hotel has substituted hyperbole for fact.

g. C2E2

As for C2E2, the Union's in-person visits to comic book store managers to ask them call Lance Fensterman and urge him to cancel the C2E2 room block at the Hotel were not coercive or threatening. The Hotel points to no evidence of any coercive impact on the stores, and it is difficult to imagine one. Unlike in *Servette*, the stores were not asked to alter their own business in any away, such as by not carrying a particular product. No manager claims to have threatened.

As for the two in-person appeals directly to Fenstermann when he toured two comic book shops, the Hotel again fails to point to any coercive or threatening conduct. The so-called "threat" to keep appealing to C2E2 participants and vendors is not unlawful because the appeals themselves were lawful, protected speech. The Hotel makes much of the Union visiting Fenstermann *twice*, but repeating a message is not inherently coercive. And whether the Union

delegations were lawfully present on private property is not relevant to whether the engaged in threats or coercion where there are no allegations that they were even asked to leave or otherwise engaged in any form of aggressive or confrontational behavior. Finally, the four or five signs carried by delegates on the second visit to Fensterman, the content of which he could not remember, are not evidence of coercion or threats. The message on a sign is no less protected than that on a handbill. The Hotel has no evidence to controvert the Union's showing that the delegation was present to deliver a message to Fensterman, not to deter customers from patronizing the store. It was therefore not "picketing"—whether or not Fensterman used that word when he canceled the Hotel contract.

h. WordCamp

With respect to the bloggers' conference, the Hotel falls well short of establishing that any conduct by the Union amounted to threats or coercion. Almost all the messages about which the Hotel complains were instigated without the Union's participation, although the record permits an inference that the Union later ratified Barbara Iverson's exhortations to participants and the public to support the Hotel strike. In any event, the messages were the same types of requests to boycott the Hotel that are permissible when made with leaflets, letters, or phone calls. The organizer canceled the contract to stop "harassment" of attendees and sponsors. Regardless whether certain individuals felt "harassed," however, the only evidence in the record is of the Union and its supporters mobilizing to disseminate its message that the Hotel should be boycotted. A reasonable jury could not conclude that the contract's cancelation was brought about by threats and coercion prohibited by § (8)(b)(4)(ii).

i. ATI

Finally, the Union's outreach to ATI is not banned under a constitutionally permissible reading of § (8)(b)(4)(ii). The Hotel makes much of an aggressive or argumentative meeting between Netza Roldan and a union delegate, but Mr. Roldan scheduled a second meeting after that, which undermines claims that he was coerced or threatened. The other conduct the Hotel complains of—frequent telephone calls and voicemails—is more of the same bothersome but hardly threatening or coercive communication that the Union used with other Hotel customers. Whether that communication was done in a way that violated some other law, the Hotel has not shown that it violated the NLRA's ban on threatening or coercive conduct toward neutrals.

With respect to ATI, unlike many of the other neutrals, there is at least some evidence of economic impact on the group. ATI says it lost $20,000 as a result of switching the venue for the tango conference and suffered a 60% membership reduction. But this is not a case where Union activity such as picketing interrupted a business and caused it to suffer losses. In those cases, not complying with the Union would lead to a financial loss, and the business complies unwillingly. The Union activity at issue here—its letters, emails, phone calls, and meetings—themselves had no coercive effect on ATI as far the evidence shows. At most, it can be inferred that the Union persuaded ATI to make the change that led to its financial loss—and thus ATI lost money not for defying the union ("coercion") but for cooperating with it. So the financial loss to ATI is not evidence that the Union's actions had a coercive effect on the organization.

\* \* \*

In summary, the Hotel cannot show that the Union engaged in conduct that is threatening or coercive as those terms have been interpreted. Concluding otherwise would extend the

statutory meaning of "threaten" and "coerce" beyond permissible First Amendment parameters.

Therefore, the Court grants the Union's motion for summary judgment.

Entered: April 8, 2013

John J. Tharp, Jr.
United States District Judge